Mark Twain used to say, if you weren't sure of a person's name or if you didn't know how to pronounce a word, you should say it with conviction and speak loudly. He said the worst thing that you could be was to be inaccurate and timid. So that's why it's Rettley. Is that right? Yes, Your Honor. Okay. And you're Burton. Are you the former President of the Senate? No, I'm not, Your Honor. You don't look like him. Well, he doesn't look like me either, Your Honor. That makes both of you very happy, I'm sure. Okay, go ahead, Mr. Burton. Thank you, Your Honor. This is an appeal from a grant of qualified immunity, which is to be reviewed de novo. And both prongs of the sossier, and I think it is sossier, not sossier, so I'll say that with conviction, sossier, the qualified immunity analysis, both prongs of it are controlled by the court's decision in Franklin v. Foxworth, which prohibits undue invasions of privacy during the execution of search warrants. The search warrant in this case was for documents relating to phony loans and bank accounts. There were three suspects, all were African American. The narrow issue here is the correctness of the trial court's ruling that the defendant deputies acted reasonably for Fourth Amendment purposes when they ordered this white couple, Max Rettley and Judy Sadler, out of their bed, naked at gunpoint at seven in the morning. The holding of Franklin is that a detention conducted in connection with the execution of a search warrant may be unreasonable if it involves an undue invasion of privacy. The standard of an undue invasion of privacy embodies the balancing test that is at the core of the Fourth Amendment's determination of reasonableness. Let me ask something as a preliminary matter. Do you have any problem with law enforcement officials executing the search warrant? They had a legitimate search warrant, probable cause was given, and they had a warrant. Do you have any problem with them executing that warrant with firearms drawn when they executed it? I do, Your Honor. However, I think that the Supreme Court's recent decision in Molnar v. Mena, I know it is Mena v. Simi Valley, the case in this court, seems to okay that. It appears that officers, if they reasonably perceive a danger, are allowed to execute search warrants with weapons drawn. Well, this court has held that pointing a weapon at someone unnecessarily is itself a use of force. That's Robinson v. Solano County. However, that was decided after this incident, and they granted the officers in that case qualified immunity. Was that a search warrant case? I'm not aware of it. That was a... An arrest case? Right, a detention on the street. I'm dealing with a search case. This is a search warrant case, not an arrest case. And as far as I'm aware, it is countenance for law enforcement officials to execute search warrants if they reasonably perceive to be a danger, which they did in this case. They said they had information that someone in the premises had a firearm, to execute the warrant with weapons drawn at the ready. Let's put it that way. I think the expression is at the ready. Well, the gravamen of our complaint is not that they had firearms out. It's that they ordered a naked couple who were not suspects and who did not have firearms and who were not suspected of having firearms out of a bed. Well, yeah, but that's part of your claim of undue invasion of your right of privacy, that they did so with firearms at the ready. Yes. All right. So I just want to establish that you don't have any problem, per se, with the fact that they had firearms at the ready when they executed the warrant. Well, the Supreme Court case was a search for gang members. This is a search for documents relating to a bank fraud. And the firearm at issue in this case was a registered firearm. Are you arguing to us that they shouldn't have had firearms at the ready when they entered the premises? No, I'm arguing to you that they should not have ordered this couple out of bed naked at gunpoint. They should not have ordered this couple out of bed naked. That's the gravamen of this appeal. All right. So the fact they had firearms at the ready is not consequential one way or the other as far as you're concerned? I think it aggravates the being ordered out of bed, but I think it's being ordered out of bed naked that is the undue invasion of privacy in this case. All right. In other words, let's assume that they came in and they drew the firearms, ordered the couple out of bed, they said, let's allow us to get dressed, and they said, fine, and that was that. You wouldn't have a case. We wouldn't be here on this appeal. That's correct. That would be a different case. If they didn't have firearms and just ordered the couple out of bed without firearms present, do you have the same case? Well, I believe that the firearms were part of what caused the compliance. So that would be a different case. But I think, yes, we would still be here if there were no firearms. And they got out of bed just on the show of police authority. But I think the fact that they had firearms pointed at them helped them comply with getting out of bed and also made the entire experience that much more degrading, humiliating, and traumatizing. Well, did they handle it according to what your friend across the aisle said, as quickly as possible, a matter of minutes, and allowed the lady and the gentleman to enrobe? And did not, according to what the district court found, they did not make an undue show of the fact that they were nude? Well, I don't know what that means, not making an undue show that they were nude. I mean, they got out of bed nude with officers of the opposite sex looking at them. But they didn't parade them. They did it in a matter of minutes. The whole affair took just a few minutes, the whole search. And they rounded them up and put them in a common room with everyone else. In other words, they didn't taunt them or anything. Is there any way that they could have gotten them out of bed with greater facility than was actually executed? I don't know what you mean by greater facility. I mean, they walk into a bedroom. There are two people who they immediately know are not suspects in this white collar bank fraud. A reasonable officer would know that a mistake had been made, that they were in the wrong house, that this was not the house that the suspects were living in. The people say to the officers, we're naked. And yet these officers, these deputies order them out of bed in full view of members of the opposite sex stark naked. Okay. So your position then is that as soon as they entered the room and they saw there were two white people in bed, they should have just left the room. Is that it? They should have, well, yes. They should have said, we have a search warrant. We're sorry. Please come out. We need to discuss this with you. And allowed them to dress privately and come out. In my opinion, they should have knocked at the door when Chase Hall, Judy's son, said, my parents are in, or my mom and her boyfriend are in the bedroom. The officer should have said, please go get them. We have some papers and we need to do a search and not gone charging into the house in the first place. I mean, don't they have some right to consider their own safety in executing this warrant and not take it on faith what was said? As I understand it, this is the usual procedure of executing a search warrant. You round up everyone in the house, put them in a common room where they can be watched, then execute the warrant. I don't know that police at any level do it any differently. Well, I'm not here to talk about other searches. This is a search for paperwork associated with an allegedly fraudulent bank transaction. But they had some information that the people they were looking for were armed. They had information that one of the three suspects had registered a firearm. None of these people had histories of violent crimes or anything like that. Well, they didn't know who was in the house. They knew that the suspects were not in the house as soon as they entered because all the people were white who were in the house and all the suspects were black people. Once they realized that an error had been made under the Liston case, they needed to back off and reconsider what they were doing and abort the search and certainly not order non-suspects out of bed stark naked first thing in the morning. You're relying on the MENA case, are you? No, we're not relying on the MENA case. We're relying on Franklin v. Foxworth, which holds that a search warrant cannot be executed in a manner which causes an undue invasion of privacy. That concept of an undue invasion of privacy requires balancing of the individual's privacy interests. In this case, two non-suspects who are naked in their marital bed together against the countervailing governmental interests, which here are nil because by the time that the officers encountered Mr. Rettly and Ms. Sadler in their bed, a reasonable officer would have known that an error had been made and they were in the wrong house. In terms of the officer safety issue, no one wants to minimize that. However, it's much more dangerous to go running in these houses without announcing your presence than it is to knock at the door and have the people come. Did the warrant require them to knock or was it no knock? It was not a no knock warrant. What happened was they were approaching the house and Chase Hall, the son, was waiting to be picked up from work. So he saw them coming. He opened the door for them. They immediately asked him, who else is here? He says, my mom and her boyfriend are in bed. They proned him out at gunpoint and then went charging into the house and encountered the plaintiffs in their bedroom. At that point, until they searched the house, how could they be sure that the black man who they were suspicious of was not also on the premises? Well, there was a group of black people, not a black man. This obviously was a family home in Lancaster, our high desert. And when they went in, there's a young white man at the door and then there's a white couple in the master bedroom. Now, they were certainly constitutionally allowed to go through the other rooms of the house and do what they call clearing it to see if there's other individuals. They did that. We're not here because of that. Once they did that, then they knew they were in the wrong house. And that was done instantaneously. I mean, that's the first thing they did. By the time they were ordering these people out of bed, there was no legitimate reason for them to have caused this really egregious violation of privacy. I thought that they ordered the people out of bed because they were worried about the presence of a firearm. Well, that's what they articulated afterwards. Okay. Why don't we hear from the government? Thank you, Ron. Good morning, Your Honor. Scott Davenport on behalf of the County of Los Angeles. May it please the Court. I think that there are a couple issues that need to be addressed here. First, in terms of the timeline, when they entered the master bedroom, that was not the culmination of the search. As one of the justices pointed out, that was something that happened fairly early on. And then they went out and they searched the rest of the house. They searched a – I believe there was a pool house. They searched a garage before it was done. So I think that the point was aptly made that just because at some point during the search they encountered individuals of a different race, it didn't necessarily mean that the case would be halted at that point. You know, I think that that is a – that might have been a compelling argument 45 years ago in the Deep South when we lived in a segregated society. But the fact is, is there could be different people of different races in a house. And that was the uncontroverted evidence that was presented to the district court. What's the earliest point at which they knew that they made a big mistake with the whole shooting match? I think it's when they cleared the house and they came back and said, you know, I think we've got the – it's not that they had the wrong house. It's that they had the right house at the wrong time because there had been a change in ownership there. And I think as soon as it – Which they could have easily checked. I – Easily checked. All you've got to do is call up any escrow company or real estate broker. They've got these computers that tell you, you know, who's in the place. Possibly. Get one of these maps and a computer, whatever it is, and you focus right down, each house. You can get any house in America. Go right down and see it. I don't know whether you can look through the window through the computer or not. But, I mean, that wasn't done, was it? That was not done. Was there surveillance done of the house? There was surveillance done of the house. It was – there was – in fact, I believe in the record, the court – the officer, the affiant, talks about a recent drive-by. I don't mean drive-by. I mean where they park over there and watch. The – And watch, you know, to see who – Right, I understand. The affidavit does talk about the steps it went through. And there was – there was, you know, when you're surveilling suspected criminals, if you leave someone parked in front of the house for two weeks, they're going to get the hint that something is going on. I was talking about parking in front two weeks. Well, you know, we know how to do surveillance. We have vans and we have all other kinds of things that we use. And I think that if – And I think in a perfect world where we had unending resources, there could have been – there's always more that could have been done. But the fact is that this is – because we're talking about qualified immunity – Was there a for-sale sign out there for a long time? There was a for-sale sign that had been removed by the time the investigation started. So when the surveillance took place, when people drove by, there was no for-sale sign? It was post-sale. Oh, post-sale. Yes, so the for-sale sign had already been removed. I think you're right that if the – How do you know that? It's the nature of the uncontroverted record is that they indicate that the people moved in the first week of September. The investigation didn't start until the last week of September. So they had a whole month to figure out, you know, who was in that place. They checked to see whether it had been – I mean, a lot of property is being turned over fast in this city. That's true, yeah. But why couldn't they – if they worried about a gun, they go in, and here are these two people in bed, and they were looking for African-Americans, they saw white Americans, and the people said, you know, we're in bed, we're both naked, and they're worried about a gun. Why couldn't they just say, all right, you know, put your hands on your head, or get your hands outside? And then they have both of them outside. Did they have a woman deputy there? I believe so, yes. Okay, they could have had – they could have handed her – put another blanket on the sheet and said to the man, all right, now get up. You just take the sheet, wrap it around yourself, and wear your pants. So they're over there. We'll grab them, take them out, and he's there naked. Put your pants on. And you have a woman deputy in there, and she could do the same thing. I'm not sure – I mean, why would – when they – I'm not sure that – She could say we're naked. Why did they say, well, we don't care? I'm not sure that that's all that different than what was actually done. I mean, they said, you know, get out, show us your hands. The woman stood up. She put the sheet around herself. Yeah. The husband went, and he got his pants and got her a robe, and they were on the couch within probably 30 seconds to a minute. Except the problem with that at this stage is that we have to draw all the facts and the inferences from the facts in favor of the plaintiffs. I don't – We can't – I understand – I mean, if in fact there is a factual issue about how long they were exposed, how long this occurred, the degree of the invasion of privacy, at this stage, and you may be able to prove elsewhere a trial, we have to draw the inferences in favor of the plaintiffs. Right. I understand that, Your Honor, but there are no factual disputes in this case. I think that there has – I'm not sure there's ever been a case that's been more amenable to summary judgment. Let me go back for a little bit on that. First of all, this was not a gun case. It was a case about white-collar crime, if you will. It was a document fraud case, identity theft. The gun was registered. The registered gun was to one of the suspects, but the information was he didn't live at that place. The information was they saw him at another residence. So what was the reasonable basis for believing that there was a gun at this residence? I think that whenever you have an ongoing conspiracy like that with co-conspirators and there's multiple locations, you're never sure who you're going to encounter at any given location. I think it was just – it's prudent. I would agree with that if we had – if it were a drug conspiracy, if we had like an Amina case where it was a drive-by shooting case, we had people that were dangerous. But at least – and you can probably correct me. I don't see anything in this record that indicate that the police, except for the registration of the firearm, believe that these suspects – the suspects, not the plaintiffs – were dangerous. I think that that was probably the determining factor. What was that again? I'm sorry. I don't see any indication that they were dangerous, except for the gun. I would agree with that. So the registration of the gun to a person who – the record does not indicate that they saw that person anywhere near this residence – is enough to say we can go into your bedroom. We think you have a gun under the sheets, and therefore you've got to get out. It's such a dangerous situation that we're going to force you to get out. I mean, I'm not quarreling with what the officers did necessarily in the scene. I understand these things happen. But on the other hand, this wasn't a drive-by shooting case. It wasn't Amina. That's true. This is a document case. That's true. But, you know, I am not – I would be reluctant as a Ninth Circuit justice to issue a law that says there are different rules that apply, depending on the type of case that you're searching for. When you're going into an individual's house – No, but it's the quality of the circumstances that we have to look at. And then you get back, and if we didn't have Freeman, I think – you know, but Freeman – Franklin, I'm sorry. Franklin seems to indicate that there – you can't invade privacy unduly in the context of a search. And Franklin, the same situation. Well, I agree with you, but Franklin is a completely different case. It could not be any more different. They used a battering ram. They pulled a clearly ill man out of bed. They left him exposed on the couch, cuffed, with his genitals exposed for two hours. Right. I agree. We're talking about just – The language of Franklin says – talks about where the privacy was invaded. And Franklin has language. And it may or may not be the term of the case, but Franklin has language that it would indicate that pulling people out of bed when you're exposing them may be an excessive search. I mean, that would be a jury question, but it may indicate that there was an unconstitutional search. Let me read it to you and see – and maybe you can shed some light on it, but I haven't. They go here – they say, first, this involves an undue invasion of privacy. First, they executed the warrant in an unreasonable manner. First, by removing a gravely ill and semi-naked man from the sickbed without providing any clothing or covering. That's the first thing they say is the invasion of privacy. Now, that's talking about degree, not whether or not he gets – that's the degree of the invasion, which is a question for the jury, not the fact that it may not be a reasonable invasion as a matter of law. I'm giving you a rambling explanation of what my concerns are so you can address it. Right. First of all, I disagree with your premise that there is any sort of a contrary fact at this point. I believe that when you look at their briefs and our briefs, we cited the same facts, we cited the same law. We have just come to completely different conclusions, and the question is, is this a constitutional violation? And if so, was it clearly established? And if so, was there a reasonable mistake? You know, when we talk about what Franklin tells us, it talks about overly prolonged, overly intrusive searches. If we had a case where they sat her out on the couch for two hours naked, I'd say, yeah, it's clearly established. You couldn't do that in Franklin. Okay, but when someone comes in, executes a warrant, and says, okay, show us your hands, get dressed, come out, wait a minute, we've got the wrong house, and immediately leaves, I don't think you can say that Franklin clearly establishes that that's a constitutional violation, assuming it is, which I'm not convinced that it is. In fact, I don't believe it is. You know, when we talk about qualified immunity, Malley v. Briggs, the U.S. Supreme Court case, talks about how it's designed to protect all but the plainly incompetent and those that knowingly violate the law. This was not that type of case. The officers did exactly what they were supposed to do. Once they realized that the suspect was not there, they discontinued the search, they apologized, and left. They did not toss the place. There was no allegations of improper force or inappropriate sexual comments or harassment of any type. I don't believe that this was the type of reasonable mistake that qualified immunity was designed to immunize, especially where in a case like this, the facts really aren't controverted. There's nothing for a jury to decide here. Well, you have to capitulate your argument to talk about qualified immunity. I thought your brief spoke that there was no constitutional violation here. Yeah, the warrant was probably improperly issued, but there was probable cause to obtain it. The judge gave you the warrant. You have to go to qualified immunity. I thought you were talking that there was no constitutional violation here in the first place. I agree that there was no constitutional violation. He alleged two different types of constitutional violation. There was obtaining the warrant, which we've conceded here in court, and the manner in which the warrant was executed. Okay, now what's your best statement as to why it was executed with guns at the ready? Well, the first point is because what? You had information there could be a firearm on the premises. That's correct. If it were just merely a paper search of an office or something like that, you wouldn't be claiming that you could do it with firearms at the ready. Not necessarily. Okay. But in this case, you had information a firearm could possibly be at the ready. That's correct. Okay. And your second point is that insofar as naked in the bed, this was the facts that you were confronted with, and as best and as quickly as possible you made amends for that. That's correct, Your Honor. Given that, why do you have to capitulate your argument to qualified immunity? I'm not capitulating anything. I'm arguing in the alternative. I don't believe there was a constitutional violation. I think he was assuming arguendo that I might find a constitutional violation, so he was switching to qualified immunity. So I always took your firm on there was no constitutional violation. That's your primary argument. That's correct, Your Honor. But if we get to qualified immunity, it's… We have this. I'm not sure whether Judge Thomas read this or not from Franklin. The detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy. Now, who decides if it involves an undue invasion of privacy? The jury decides that, I would think. Well, where the facts are undisputed, Your Honor, I think that you guys do on a de novo review. Well, if you ask me, I think there's an undue invasion of privacy, but I think that's for a jury to decide. I think what I would be… I talked about how I would be reluctant to issue a holding that said, you must immediately discontinue a search whenever you see a person of a different race. When you knew that this one party had a gun registered in their name, well, you know, people who go around and shoot up other people don't have that weapon registered, do they, with the sheriff's office or the LAPD? They don't register their guns, do they? You know, I'm not… I wouldn't think so. I'm not sure that this is evidence that was ever before the district court. Well, but the thought bothers me about this case. And, you know, I mean, you had the two people there. They knew their names, right? Huh? When the two people were in bed, you knew who they were? Not at the time. Well, they could have asked them, right? That's correct. Where's your wallet? Let me see your driver's license. And they have those little computers you run. You can run a make on them. Did they have any record? You know, I don't know. And to be honest with you, that would probably have taken longer than the time they actually spent conducting the search. I don't know. I don't know. They could have had their hands out and just gone out and checked to see who they were. I would be reluctant to say you have to call off a search whenever you go into a house and you find naked people in there. No, I don't think that's the question. The question is, when the husband, when the male says, let me put a robe on her, and they say no, then, and you've had no suspicion at that point that there's a firearm in the bed, and you're seven in the morning, they're in the wrong house, that tips it over into a question on Franklin. I'm not quarreling with you. I'm just saying that the argument is that it's not saying, oh, we have to call off the search, we have to issue a ruling like that. No, it says that once you become convinced that there's no firearm present or no danger, then you have to take a little more reasonable methods. And I don't know at that point. Obviously, qualified immunity protects people in the sense of making split decisions in emergency circumstances. But at that point, there was really little to believe. He says, please, I'll get out. Let me get my pants on. No, don't get on your pants. If I allow him to get in pants, may I get a robe for her? No. I don't understand that. When there's absolutely no reason at that point to believe there's a gun there. Let's also remember that she was covered with a sheet. It's not like she was standing there naked. This was. But you had to get up and she stood naked, didn't she? She stood up and then covered herself with a sheet. Are you married? Yes, Your Honor. Would you like the sheriff to do that with your wife? I am not. I am not diminishing the nature of the violation. What I'm saying is when you come up with an argument that says, look. You should have used your heads when they went in there. Look, there was an argument that when they saw naked people in the bed, they should turn their backs on suspects where they think there's a gun. That's what opposing counsel said. That's ridiculous. No, but you're biting down straw people now. I mean, I'm just saying what the best argument is, I think, for the other side. Under Franklin, which a similar circumstance occurred, and they said that this was a constitutional violation. No, no, don't back off yet. Franklin has some broad language that could arguably say that once you became certain that there was no firearm or danger present, then it would probably be an invasion of privacy to order people out of bed naked. I know you'll say it's two hours. Certainly, Franklin is a much more egregious situation than this. I grant you that. But I'm just saying that's the argument. So when you say you'd have to say develop a large rule that would handcuff police, no, that's the argument is that a jury is entitled to determine whether or not at that point their actions are reasonable. That's the argument. The problem with that is there are no conflicting facts to resolve in this case. The facts are what they are. I think the briefs read virtually identical. It was on videotape. Everything tracks. The question is, it's just, what do we call this? The whole thing was on videotape, too, huh? Yeah. You got her standing there naked in videotape. It was on the – what happens, they waited outside until the house was clear. They click it on with a timer. We know that the entry is made at 30 seconds. We know at minute two, when the place is secured, they're seated on the couch, and at that point the video camera comes in. They don't bring a video camera in when they're still clearing the house. But once it's secure, then they bring it in because they're going to videotape the search. I mean, this was sort of a by-the-book search. And once they realized that something was wrong, they immediately left. Like I said, we have just – the facts are what they are, and the question is, what does that mean legally? I have my opinions, and opposing counsel and Justice Ferguson have theirs. The question is, as a matter of law, under these uncontroverted facts, are they entitled to qualified immunity? And that's not a determination for the jury. At the time that they observed the two people in bed naked, they were told they were naked, at that time did they have any fear that there might have been a firearm that could have been used against them? Yeah, I think that's – Under what factual scenario? Well, I think whenever you're executing a warrant like this in a felony case, you know that one of the suspects has a gun. You are careful whenever you enter a house. But you know that the person that the gun was registered with was a black gentleman, not a white person. Individualized suspicion with respect to this particular suspect, no, because they had no idea who the suspect was. They didn't accept that. They knew it was an African-American, and the second thing they knew was that the last time they'd been observed it was at a different address. His car was observed at the other address where they executed the search, right? So what gave them reason to believe that this guy was at this address at 7 in the morning? And if you're saying that a registered gun for one conspirator means that all of them may be carrying guns, I'm not sure how far that gets you as far as individualized suspicion. I'm not quarreling with you. I'm just asking questions. I appreciate that. Excuse me. I'm not sure how to answer you without reiterating what it is we've already been talking about for 22 minutes, which is five times as long as the search took. And that's something that we need to remember, is it was such a rapidly evolving, quick thing that we have spent months briefing and now 35 minutes combined talking about, and we were out of there in four or five minutes. So again, like I said, this is the type of reasonable mistake. If you can't grant qualified immunity in this case, you have completely gutted it. There's nothing left. The facts are undisputed. And we're talking about a minimally invasive search where there's no evidence whatsoever of any excessive force, sexual comments, harassment. There's no evidence of that. It was an embarrassing thing. I grant you that. See, here's the problem, though. Their best argument, I think, is under Franklin, where they said hauling somebody out of bed naked and making them sit on a couch violates their constitutional rights. An invasion of privacy is an unreasonable search, and damages may be awarded. All right, now what are the possible permutations of that? Your argument would be, well, the outer limit is three hours. This was different circumstances. Here, their argument is, look, you may have had a right to come in with guns. You may have a right to a search warrant. You may have a right to come into the bedroom. But once you understood that there was no gun in the bed and these people were not the suspects, that you didn't have a right to order me out of bed naked, that made the search unreasonable. And that's their argument. Right, and that's why the timeline is important. No reasonable officer, having determined that the suspects were not in bed, that there was no gun in bed, no reasonable officer could order people out naked. That's their case. But they were ordered out of bed before the entire house was cleared, before the entire search, the entire clearing was completed. So it's not like they cleared... What's the difference? It's a huge difference. It's not like they cleared the house and they said, geez, we got the wrong place, okay, get out of bed anyways. It was in the middle of the search. They said, you know, get out of bed, show us your hands. Other officers went on. They searched the rest of the house. They searched the pool room or the pool house. They searched the garage. And then when they come back and the people are already seated on the couch, they say, you know what, I think we got the wrong place. And they left. They did what they should have done. There's no suspicion of the gun. And do they have a right to order them out of bed naked? I think not. I wouldn't be prepared to concede that. I think that whenever you're executing a search where there's multiple parties in the house, you've got to take control of the situation. You never know what's going to be present, what could be used for a weapon, what sort of destruction of evidence or flights can occur. You take control of the situation. You assemble them in a location where they can be observed. And then you conduct your search. They assembled everybody. They realized, hey, we're not going to conduct the search here. And they left. So I don't. . . Well, there's a lot of things they could have done. You know, they could have. . . For example that I gave you, they could have brought a. . . had the guy get out. And then they had another blanket there for the woman. And then they had a woman deputy in there. Or they could have said, Wilson, put your hands out. You know, you could have handcuffed her. You know, and there are always things that could have been done differently. Yeah, but I, you know, all . . . I never had a situation like this come up. I've been doing this for . . . 40 years and six months and one day. I've never had. . . I've never had anything like this. You know, I could see if you went into a different type of situation that, you know. . . Well, maybe. . . If you were in a . . . I don't want to even get into that, but. . . I'm sure you don't have anything on these people. You've got a warrant. Nobody checked to see if people still are at that address. It's the easiest thing in the world to do. It was either coming to the judge with the information that was a month old. And your search warrant. Huh? It was . . . It turned out to be stale information. Stale information, yeah. The judge just looked at it and said, okay, and just signed it. I don't know. Well, there's no claim here of impropriety in the obtaining of the warrant, though. None. I do just want to leave you with one thought. I know I'm way over my time here. I think that it is just a huge stretch to say. . . Thank you. I just think it's a huge stretch to say that the law is clearly established within the meaning of sacier in light of the Franklin case that the officer's actions were improper. Franklin describes a big litany of atrocities that you clearly cannot do. This is absolutely on the other end of the spectrum. I don't think when you look at Franklin you can say, hey, anytime there's any suspect that's naked in bed, you can't order them out of bed. You can't question them for the purposes of . . . for the total time of one minute. In Franklin, were there women officers? You know, I don't know off the top of my head, Your Honor. I know that it was a severely ill man that was left with his genitals exposed for two hours, sitting on the couch in cuffs. Clearly, you can't do that. That's clearly established. We're talking about something . . . We didn't know he was ill. We needed to secure the property while we were doing the search. We're entitled to . . . If that was our situation, I wouldn't be here arguing qualified immunity with you. But I don't see how you can say it's clearly established. You've been more than patient with me. Thank you for being patient with the questions. Thank you, Your Honor. Thank you. Can I just have one minute? Sure. For some of the factual matters. There's no pool house. There was a pool house when they bought it. It had been dismantled. The for sale sign had gone down in September. This raid took place in mid-December. So it was about two and a half months that they had lived there. In terms of the degree of exposure, I think the best would be page 11 of their brief, where it says Sadler, that's Judy Sadler, the woman, was naked in front of Campbell, that's Deputy Campbell, a male, for about one minute. There was Irma Gonzalez, who was a deputy in the household, a female. So they did have that available. She did see Mr. Retley while he was naked. And in terms of their police records, Judge Pragerson, you asked about that. Mr. Retley is a civilian employee of the United States Department of Defense. He worked out at one of those air bases and has a security clearance and no criminal record whatsoever. Ms. Sadler works for some real estate company, and she also has no criminal record whatsoever. Chase Hall, the young man, was 17 and waiting to be picked up to go to high school. Thank you. Just one question. I think the most difficult argument for you is that you only have Franklin, right? That's the only case you've got. And Franklin is a more egregious case than this. What in Franklin would you point us to to say that the law was clearly established, that a brief order, of course, in Franklin it was a couple of hours, but what's the best statement in Franklin you can point to that says that this type of circumstance was a violation of constitutional law and was clearly established at the time of this incident? Well, in terms of Franklin, which I do contend is controlling, they said this was a very— The language was the language that Your Honor read, which was a detention conducted in connection with a search may be unreasonable if it involves an undue invasion of privacy. I think putting in an ellipsis in the right place has it read like that. And so what is an undue invasion of privacy? That is an invasion of privacy that is not outweighed by a countervailing governmental interest. And here there was no governmental interest in ordering these people out of bed. The ordering out of bed is a very, very serious invasion of privacy, as Judge Ferguson pointed out, and exposing a spouse in front of another spouse at gunpoint, members of the opposite sex. So that had to be outweighed by some countervailing governmental interest. And here the person in bed was not Trelon Scott, who had the 31-year-old black male who had the weapon registered to him. No, but they don't know where the weapon is. He could have it, he could hide it in the house. They're not aware of where the weapon is, do you? Well, they're aware that this is not the person who has the registered weapon that they know about. They may be aware of that, but they know that a person who has been at the house or frequent the house has a weapon. They don't know where the weapon can be. I mean, why would it be unreasonable for a police officer to say, well, it's registered to Jones, but maybe Smith has the weapon? That happens, you know. Well, firearms are common in the United States. This is a well-known fact. Does that mean that any time a police officer winds up in someone's bedroom by mistake, that they can order an essentially married couple out of bed naked? Well, at the time they're in the bedroom, at that point, the officer that's there may not have been aware it was a mistake at that point. Oh, absolutely he was, because they were all briefed that these were black suspects. That's in the record. That's absolutely clear. They don't know whether the black suspect is in the house yet until they clear the house, get everyone in a common room, and conduct their search. This is a 1,500 to 2,000-foot, three-bedroom family home.  They ask Chase Hall, when they encounter him at the door, who's here? My mom and her boyfriend are in bed in the master bedroom. They go in the master bedroom. It only takes a moment to see who's there. A police officer is not going to take someone's word for who's there. They're going to look at the entire house. Any police officer with half a brain is not going to take their word. They don't know who's hiding somewhere. So they've got to have some time to clear the house, put everyone in a common room, and then they know for sure that they made a grand mistake here. So I'm a little concerned as to whether or not what they did was—well, we'll talk about it later. Thank you very much. Well, you know, the moral of this case is always wear your pajamas when you go to bed. Thank you, Your Honor.
judges: Pregerson, Cowen, Thomas